Jose Velez
3936 S Semoran Blvd #317
Orlando, FL 32822
Tel.: (407) 456-4880
Fax Number: n/a
Email: jvelez2@protonmail.com
Plaintiff *In Propria Persona*

FILED'19 SEP 16 12:51USDC-ORM

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JOSE VELEZ,<br>                    Plaintiff,<br><br>    vs.<br><br>JASPER'S CAFE OREGON LLC,<br>ROSARIO'S ITALIAN RESTAURANT,<br>NOHO'S MEDFORD, INC., Does 1-10,<br>inclusive.<br>                    Defendant(s) | Case No.: 1:19-CV-01489-AA<br><br>COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES |

Plaintiff, JOSE VELEZ hereby complains and alleges as follows:

## NATURE OF THE ACTION

1.       This is an action seeking to remedy unlawful discrimination by the Defendants against the Plaintiff in the Defendants' place of public accommodation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA") and the Oregon Unlawful Trade Practices Act ("UTPA"), Or. Rev. Stat. § 646.608(1) (the "UTPA").

2.      This lawsuit is necessary because the Defendants failed to remove accessibility barriers and because the Defendants continue to maintain barriers in violation of the ADA and the UTPA as described herein.

3.      Plaintiff personally encountered the barriers in violation of the ADA and the UTPA described herein and took photos of the barriers with his iPhone. The metadata of the digital images will confirm the date and geolocation of the images, where the barriers are located. Plaintiff personally visited the public accommodation and paid with his credit card as a bona fide patron. Plaintiff's credit card statement will confirm the credit card transaction.

**PARTIES**

4.      Plaintiff, Jose Velez, is a person with mobility-related limitations because morbid obesity (approximate BMI: 44.4), a "disability" within the meaning of the ADA. Taylor v. Burlington N. R.R. Holdings Inc., 904 F.3d 846, (9th Cir. 2018); BNSF Railway Co. v. Feit, 281 P.3d 225 (Mont. 2012). His additional weight on his frame makes it more difficult, well beyond the normal range, walk, stand, and bend. The problems with executing these basic physical tasks creates limitations in maintaining strength and mobility, as well as in performing basic activities of daily living. Plaintiff's increased body weight does interfere with his normal musculoskeletal function through a variety of kinetic and kinematic impairments, which causes impaired balance, abnormal

gait patterns and increased incidence of muscle weakness. Because of this, Plaintiff is in increased risk for falls. Plaintiff's gait is compromised through reduced velocity, cadence, step width, and step length, as well as stance duration. Problems with executing these basic physical tasks creates limitations in maintaining strength and mobility, as well as in performing basic activities of daily living well beyond the normal range. Plaintiff also uses an altered strategy for sit-to-stand (and vice versa) due to back pain, lack of strength, and lack of balance. Plaintiff's Morbid obesity is, by itself, a disability because it is a physical impairment: a condition that affects one or more body systems (neurological, musculoskeletal, respiratory, cardiovascular, ability to walk, stand, run, bend). Also, Plaintiff's Morbid obesity is also a disability because it is caused by physiological reasons beyond Plaintiff's control related to the functioning of his brain. Plaintiff experiences recurrent episodes of binge-eating such as: Eating, in a discrete period of time, an amount of food that is definitely larger than what most people would eat in a similar period of time under similar circumstances; A sense of lack of control over eating during the episode. For example, Plaintiff feels that he cannot stop eating regardless of how much he is eating; Eating much more rapidly than others; Eating until feeling uncomfortably full. (e.g. until there is difficulty breathing); Eating large amounts of food when not

feeling physically hungry; Eating alone at restaurants or home because he feels embarrassed by how much he is eating; Sometimes he feels disgusted with himself or very guilty afterward; The binge eating occurs, on average, at least four to five times a week. The binge eating is not associated with the use of inappropriate compensatory behaviors, such as purging; BED is disorder formally recognized in the Diagnostic and Statistical Manual of Mental Disorders (DSM–5). The DM-5 is the product of more than 10 years of effort by hundreds of international experts in all aspects of mental health. It is an authoritative volume that defines and classifies mental disorders.    In additional, the medical community recognizes obesity as a primary disease. The medical evidence shows that obesity is always an impairment because it is a physiological disorder or condition affecting one or more body systems. Obesity qualifies as an impairment that is physiological because it involves the organic process and phenomena of an organism-the excessive accumulation of fat cells. The medical community recognizes obesity as a disorder. Just because obesity is often diagnosed by measuring weight doesn't mean that it is not a physiological disorder affecting body systems. The Overwhelming consensus in the medical community is that obesity is a disease in and of itself. Obesity satisfies the AMA criteria for labeling something a disease. That recognition of obesity as a disease is supportive of

the conclusion obesity is a physiological disorder under the federal and state statute. The Webster's defines "disorder". A disorder under Webster's is a derangement of function and an abnormal physical or mental condition. A disease fits within that definition. The medical evidence shows obesity is an abnormal condition. The AMA has stated that obesity is a disease involving abnormal energy balance and abnormal endothelial function resulting in metabolic abnormalities even after weight loss. The medical evidence also shows that obesity itself affects one or more body systems including neurological, musculoskeletal, special sense organ, respiratory, including speech organ, cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine. In particular, obesity itself affects the cardiovascular or circular system, the musculoskeletal system, the lymphatic system, and the endocrine system.

5. The business establishments at issue in this complaint discriminated against Plaintiff and prevented Plaintiff from enjoying full and equal access thereto due to the existence of unlawful architectural barriers that violate the ADA as described in more detail herein.

6. Defendant, Jasper's Café Oregon LLC d/b/a Jasper's Cafe, owns, operates, or leases real property located at 2739 N Pacific Hwy, Medford, OR 97501. Defendant, Rosario's Italian Restaurant, own, operate, or lease real property

located at 2221 W Main St, Medford, OR 97501. Defendant, Noho's Medford, Inc., owns, operates, or leases real property located at 330 E McAndrews Rd, Medford, OR 97501. These properties, collectively referred to as the "Subject Property," share common violations to the ADA unless otherwise indicated.

7.   The Subject Property is a facility open to the general public, a public accommodation, and a business establishment insofar as it provides goods and/or services to the general public.

8.   Defendant Does 1 through 10, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to the Plaintiff. When their true names and capacities are ascertained, Plaintiff will amend this complaint by inserting their true names and capacities herein. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by those Defendants.

## JURISDICTION AND VENUE

9.   This Court has jurisdiction over the subject matter of this action pursuant 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4) for violations of the ADA.

10.   This Court has supplemental jurisdiction over the state law claims alleged herein under the UTPA because the state law claim is an attendant and related

cause of action that arises from the same nucleus of operative facts and arising out of the same transaction or occurrence as the federal law claims set forth herein.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) based on the fact that the real property that is the subject of this action is located in this district and the Plaintiff's causes of action arose in this district.

## STATEMENT OF FACTS

12.    The ADA establishes different standards depending on when the facility was constructed and whether the facility has been altered since January 26, 1992. 28 C.F.R. §§ 36.401, 36.402.  Existing facilities are required to remove barriers to access for persons with disabilities where removal is "readily achievable." 42 U.S.C. § 12182(b)(2) (A)(iv); 28 C.F.R. § 36.304.  Facilities designed and constructed for first occupancy after January 26, 1993, must be accessible to persons with disabilities unless the entity can demonstrate that it is "structurally impractical."  42 U.S.C. § 12183(a). Finally, alterations after January 26, 1992 must be made to ensure that, to the "maximum extent feasible," the altered portions of the facility are accessible.  28 C.F.R. § 36.402(a)(1).

13.    The original ADA design Standards were first published in 1991 and are set forth at 28 C.F.R. Part 36, Appendix A (the "1991 Standards").  The new ADA

design Standards were first published in 2010 and are set forth at 28 C.F.R. Part 36, Subpart D (the "2010 Standards"). Both Standards are available at www.ada.gov. New construction and alterations commenced between September 15, 2010, and March 15, 2012, must comply with either the 1991 Standards or the 2010 Standards. All new construction and alterations commenced on or after March 15, 2012 must comply with the 2010 Standards.

14.     Plaintiff alleges on information and belief, the Subject Property was designed and constructed for first occupancy after January 26, 1993. *See* 28 C.F.R. § 36.401.

15.     Plaintiff alleges on information and belief, the Subject Property is located in a facility that was constructed after January 26, 1993. S*ee* 28 C.F.R. § 36.401.

16.     On information and belief, the Subject Property undergone alterations after January 26, 1992. The term "alterations" includes, but is not limited to, remodeling, renovation, rehabilitation, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full height partitions. Normal maintenance, re-roofing, painting or wallpapering, asbestos removal, or changes to mechanical or electrical systems are not alterations unless they affect the usability of the building or facility. *See* 28 C.F.R. § 36.402(b).

17.     Alternatively, if the Subject Property was *not* designed and constructed for first occupancy after January 26, 1993, the Subject Property is an existing facility required to remove barriers to access for persons with disabilities where removal is "readily achievable." 42 U.S.C. § 12182(b)(2). The ADA provides that, when assessing whether barrier removal is "readily achievable," the factors to consider include the "resources" of the facility, 42 U.S.C. § 12181(9)(b), which includes "the overall financial resources of any parent corporation or entity," 28 C.F.R. § 36.104.

18.     Service counters, seating areas and restrooms are among the facilities, privileges and advantages offered by the Defendants to patrons of the Subject Property.

19.     The Subject Property is not fully accessible to Plaintiff or similarly situated persons with mobility disabilities to the barriers at the Subject Property.

**COMPLIANCE WITH THE STANDARDS & POLICIES, PRACTICES, AND PROCEDURES**

20.     Plaintiff visited, within the last two years, Jasper's Cafe at 2739 N Pacific Hwy, Medford, OR 97501as a bona fide patron. During Plaintiff's visit to the public accommodation, Plaintiff personally encountered several architectural barriers described in this paragraph. Based on Plaintiff personal experience at accessible and non-accessible facilities, and based on Plaintiff's knowledge of the ADA Standard for Accessible Design, published by the U.S.

Department of Justice at https://www.ada.gov/, and based on his personal visit
to the restaurant, and based on images obtained of the public accommodation
that Plaintiff personally took and subsequently examined, the property was
not in compliance with the ADA because of the following:

i. The restaurant contains more than one dining area with different
services and décor provided in each dining area (e.g., indoor seating,
outside dining areas with views) See 1991 Standards § 5.4; 2010
Standards §§ 206.2.5, 226. There are moveable tables, fixed tables and
counters are provided in each dining area. Movable tables. There are no
accessible movable tables in compliance with § 36.302(a); 1991
Standards §§ 4.32; 2010 Standards § 902. The moveable tables with
accessible seating locations should be dispersed throughout all dining
areas. § 36.302(a); 1991 Standards § 5.1; 2010 Standards § 226.2. There
is no accessible route to accessible seating locations at moveable tables.
See 1991 Standards § 5.3; 2010 Standards Chapter 4. There is no 30-
inch wide minimum clear floor space extend 17 inches minimum under
the table. See Title III Regulations § 36.302(a); 1991 Standards §§
4.32.2, 4.2.4; 2010 Standards §§ 902.2, 305. There is no knee clearance
(from the floor to the bottom of the table or support brackets) 27 inches

high minimum. § 36.302(a); 1991 Standards § 4.32.3; 2010 Standards §§ 902.2, 306.

ii. Restroom. The men's restroom does not have an accessible door.   See 1991 Standards §§ 4.1.3(7), 4.1.3(11), 4.22.2, 4.13; 2010 Standards §§ 206.5, 404. Rear and side grab bars are not provided at the men's accessible toilet are improperly installed.   See 1991 Standards §§ 4.1.3(11), 4.22.4, 4.16.4, Fig. 29, 4.17.6, Figs. 30(c) & (d); 2010 Standards §§ 213.2, 213.3.2, 604.5. The restroom does not include the accessible features listed above at (a), (b) and (d).  See 1991 Standards §§ 4.1.3(11), 4.22; 2010 Standards §§ 213, 603. The clearance below lavatory is in violation of Section 306.2: no less than 17 inches and no greater than 25 inches of the clear floor space extend under the lavatory. Lavatory does not comply with Section 306.2.



21.      Plaintiff visited, within the last two years, Rosario's Italian Restaurant at 2221 W Main St, Medford, OR 97501 as a bona fide patron. During Plaintiff's visit to the public accommodation, Plaintiff personally encountered several architectural barriers described in this paragraph. Based on Plaintiff personal experience at accessible and non-accessible facilities, and based on Plaintiff's knowledge of the ADA Standard for Accessible Design, published by the U.S. Department of Justice at https://www.ada.gov/, and based on his personal visit to the restaurant, and based on images obtained of the public accommodation that Plaintiff personally took and subsequently examined, the property was not in compliance with the ADA because of the following:

    i. Checkout counter (2010 ADA Standards for Accessible Design – 904.4.1): All portions of the counter are higher than 36 inches above the floor. Possible readily achievable solution: lowering a section of the counter. Service counter fail to meet all requirements of Section 904 of the 2010 for Accessible Design. For example, without limitation: counter height, width, depth.

    ii. The restaurant contains more than one dining area with different services and décor provided in each dining area (e.g., bar area, dining areas with views) See 1991 Standards § 5.4; 2010 Standards §§ 206.2.5, 226. There are moveable tables, fixed tables and counters are provided

in each dining area. There are no accessible movable *and* fixed tables in compliance with § 36.302(a); 1991 Standards §§ 4.32; 2010 Standards § 902. The tables with accessible seating locations should be dispersed throughout all dining areas. § 36.302(a); 1991 Standards § 5.1; 2010 Standards § 226.2. There is no accessible route to accessible seating locations at moveable tables.  See 1991 Standards § 5.3; 2010 Standards Chapter 4. There is no  30-inch wide minimum clear floor space extend 17 inches minimum under the table.  See Title III Regulations § 36.302(a); 1991 Standards §§ 4.32.2, 4.2.4; 2010 Standards §§ 902.2, 305. There is no knee clearance (from the floor to the bottom of the table or support brackets) 27 inches high minimum. § 36.302(a); 1991 Standards § 4.32.3; 2010 Standards §§ 902.2, 306.

iii. Restroom. The rear and side grab bars provided at the men's purportedly accessible toilet are improperly installed, as they are 40 inches high. See 1991 Standards §§ 4.1.3(11), 4.22.4, 4.16.4, Fig. 29, 4.17.6, Figs. 30(c) & (d); 2010 Standards §§ 213.2, 213.3.2, 604.5.

iv. The restaurant does not provide accessible parking spaces in open and malicious violation of the guidelines of the U.S. Department of Justice. https://www.ada.gov/restripe.htm.

22.     Plaintiff visited, within the last two years, **Noho's Medford, Inc. d/b/a Noho's Hawaiian Cafe** at 330 E McAndrews Rd, Medford, OR 97501as a bona fide patron. During Plaintiff's visit to the public accommodation, Plaintiff personally encountered several architectural barriers described in this paragraph. Based on Plaintiff personal experience at accessible and non-accessible facilities, and based on Plaintiff's knowledge of the ADA Standard for Accessible Design, published by the U.S. Department of Justice at https://www.ada.gov/, and based on his personal visit to the restaurant, and based on images obtained of the public accommodation that Plaintiff personally took and subsequently examined, the property was not in compliance with the ADA because of the following:

   i.   Counter where drinks are served. (2010 ADA Standards for Accessible Design – 904.4.1): All portions of the counter are higher than 36 inches above the floor. Possible readily achievable solution: lowering a section of the counter. Service counter fail to meet all requirements of Section 904 of the 2010 for Accessible Design. For example, without limitation: counter height, width, depth, and clear floor space for a parallel or frontal approach, among others.

   ii.  The restaurant contains more than one dining area with different services and décor provided in each dining area (e.g., bar area, dining

areas with window views) See 1991 Standards § 5.4; 2010 Standards §§ 206.2.5, 226. Moveable tables are provided in each dining area. Movable tables. There are no accessible movable tables in compliance with § 36.302(a); 1991 Standards §§ 4.32; 2010 Standards § 902. The moveable tables with accessible seating locations should be dispersed throughout all dining areas. § 36.302(a); 1991 Standards § 5.1; 2010 Standards § 226.2. There is no accessible route to accessible seating locations at moveable tables. See 1991 Standards § 5.3; 2010 Standards Chapter 4. There is no 30-inch wide minimum clear floor space extend 17 inches minimum under the table.   See Title III Regulations § 36.302(a); 1991 Standards §§ 4.32.2, 4.2.4; 2010 Standards §§ 902.2, 305. There is no knee clearance (from the floor to the bottom of the table or support brackets) 27 inches high minimum. § 36.302(a); 1991 Standards § 4.32.3; 2010 Standards §§ 902.2, 306.

III. Restroom. The men's restroom does not have an accessible door.  See 1991 Standards §§ 4.1.3(7), 4.1.3(11), 4.22.2, 4.13; 2010 Standards §§ 206.5, 404. The rear and side grab bars provided at the men's accessible toilet are improperly installed.  See 1991 Standards §§ 4.1.3(11), 4.22.4, 4.16.4, Fig. 29, 4.17.6, Figs. 30(c) & (d); 2010 Standards §§ 213.2, 213.3.2, 604.5. The restroom does not include the accessible

features listed above at (a), (b) and (d). See 1991 Standards §§ 4.1.3(11), 4.22; 2010 Standards §§ 213, 603. The clearance below lavatory is in violation of Section 306.2: no less than 17 inches and no greater than 25 inches of the clear floor space extend under the lavatory. Lavatory does not comply with Section 306.2 because there is a cabinet below the lavatory. Because of an obstruction the men's restroom does not comply with the configuration illustrated below. This obstruction is a urinal improperly located and, even if properly located, it is mounted too high.



**SINGLE-OCCUPANT TOILET ROOM**



### DEFENDANTS POLICIES PRACTICES AND PROCEDURES

23.    The ADA generally obligates public accommodations to make reasonable

modifications in their policies, practices, and procedures when the

modifications are necessary to afford goods, services, facilities, privileges,

advantages, or accommodations to individuals with disabilities. 28 C.F.R. §

36.302. Defendants do not have any written policies, practices, or procedures

concerning the provision of services to guests with disabilities. As to Section

12182(b)(2)(A)(iv), Congress was explicit: "The section may require the

removal of physical barriers, including those created by the arrangement or

location of ... movable structures [such] as furniture, equipment and display racks. For example, a restaurant may need to rearrange tables and chairs or a department store may need to adjust its layout of display racks and shelves." S.Rep. No. 116, 101st Cong., 1st Sess., at 66 (1989) (emphasis added); H.R.Rep. No. 485, 101st Cong., 2nd Sess., pt. 2, at 110, reprinted in 1990 U.S.C.C.A.N. 303, 393 ("H.R.Rep. No. 485(III)"). In another passage, Congress reiterated its intent in another way. "The same principles apply to the question of whether aisles have to be widened." H.R.Rep. No. III at 61. No written policy specifies that its employees and future employees will receive basic training on how to accommodate persons with disabilities (e.g., overview of the restaurant's accessibility features, arrangement of movable tables, dealing with service animals, etc.) See 28 C.F.R. § 36.302(a). No written policy specifies that the staff is to be trained to offer assistance, upon request, to persons with disabilities who may need assistance in using the services.  See 28 C.F.R. § 36.302(a). Defendants' written policy, if any, do not specify that the staff is to be made available to move tables, and provide and adjust accessible features of the facility when features require installation or adjustment to ensure accessibility.  See 28 C.F.R. § 36.302(a). The defendants' written policy does not specify that all printed materials provided for use by patrons, also be available in alternate formats so that blind persons

and persons with low vision can read them. (Alternate formats include Braille, large print, and audio recordings).   See 28 C.F.R. § 36.303(b); 36.303(b) (Although Plaintiff does not request that Braille format be provided, it is relevant to show defendants extensive lack of compliance and reckless disregard to the ADA).

24.     Maintenance and procedures to keep unobstructed clearance space is not structural in nature, it is a maintenance and policy issue that involves human discretion. It is well established that voluntary cessation of allegedly illegal conduct in the face of litigation does not deprive the court of the power to hear the case and issue injunctive relief. United States v. W.T. Grant, Co., 345 U.S. 629 (1953); see also County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (a dispute is not moot unless there is no expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged. No interim events have irrevocably eradicated the effects of the violation, because defendant is free, at his discretion and at any time, to fail to provide adequate maintenance and cause obstructions.

25.     As discussed above, Plaintiff personally encountered architectural barriers that constitute ADA violations at the Subject Property and was denied full and equal access because of each of the violations. For example, Plaintiff actually

used the inaccessible restrooms described above. From that date to the present, the Plaintiff has been deterred from the public accomodation because of his knowledge of the existence of barriers that violate the ADA. Despite Plaintiff's determent, he is free to visit the property at any time and reserves his right do to so during the pendency of this action, as explained by the U.S. Department of Justice:

https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/chapman.pdf

26.     The existence of access barriers and ADA violations at the public accommodations caused the Plaintiff unnecessary difficulty and discomfort. For example, lack of tables with the spaces required by the standards makes it more difficult for the plaintiff to sit and use the tables because of his large frame. Similarly, if all tables are too close to each other, plaintiff experiences difficulty seating, standing and moving around the dining area. Similarly, if the photographed toilet room has grab bars near the toilet that are improperly located or inexistent, Plaintiff experiences, like he experienced in fact during his visits, caused unnecessary difficulties and discomfort. Moreover, when the required spaces and clearances are not provided, those barriers unnecessarily interfere (not necessarily "deny") plaintiff's full and equal access to the facilities.

27.    Plaintiff will return to Subject Property after obtaining injunctive relief for the purpose of monitoring the alterations at the property and enforcing any order entered by Court by, among others, testing the property for ADA compliance. Civil Rights Education and Enforcement Center v. Hospitality Properties Trust, No. 16-16269 (9th Cir Aug. 7 2017) (holding that there is constitutional standing where a plaintiff's only motivation for visiting a facility is to test for ADA compliance).

28.    The Plaintiff personally encountered architectural barriers that constitute ADA violations at the Subject Property and was denied full and equal access because of the violations. From that date to the present, the Plaintiff has been deterred from the Subject Property because of his knowledge of the existence of barriers that violate the ADA.

29.    The existence of access barriers and ADA violations at the Subject Property caused the Plaintiff unnecessary discomfort.

30.    Plaintiff has the financial resources to travel and visit these properties to confirm whether the ADA issues are still at the property.

31.    Plaintiff intents to visit the Subject Property and the business establishments threat and intends to do so but will be deterred from doing so until the violations are cured.

32.     On information and belief, the violations identified above are readily achievable. The Department of Justice describes many of these kinds of barriers as presumptively readily achievable to remove and Plaintiff contends that the removal of them is easily accomplishable without much difficulty or expense. Likewise, even if strictly compliant barrier removal were not achievable, there are many kinds of alternative accommodations that could be made to provide a greater degree of accessibility to the Plaintiff and similarly situated persons with mobility disabilities.

33.     On information and belief, Plaintiff alleges that the failure to remove barriers has been knowing, willful, intentional, and malicious because:

  i.  The barriers described herein are clearly visible and tend to be obvious even to a casual observer;

  ii.  Defendants historically failed to acknowledge that ADA compliance it not a one-time effort, but an ongoing obligation. They refused to promptly remove barriers or create alternative accommodations;

  iii.  The Defendants operate the Subject Property and have control over conditions thereat. They have, and have had, the means and ability to make the necessary remediation of access barriers if they had ever so intended.

iv.  Today, businesses have an obligation to become accessible, and there is a consequence if they do not: they could be sued. Defendant failed to be proactive and to provide access on its own. Defendant took a "wait and see" attitude. Nearly 28 years since the ADA was enacted on July 26, 1990, Defendant was expected to comply with its legal obligations.

v.  Defendants ignore the daily experience of thousands of people with disabilities who cannot shop, transact personal business, visit the doctor, or enjoy recreation like most people take for granted, because so many public accommodations across the country, like defendants, have ignored the reasonable requirements of the ADA. The ADA is the difference between participation and exclusion on a daily basis.

vi.  Plaintiff was not required to provide a written notice of the accessibility issues. No other civil rights law permits businesses to discriminate without consequence unless and until the victims of discrimination notify the business that it has violated the law. The ADA does not place the heaviest burden for ending discrimination on the very people the law is there to protect.

vii.  The ADA is already very carefully crafted to take the needs of business owners into account. Compliance is simply not burdensome. The careful compromise originally designed by a bipartisan Congress in

1990, provides that existing businesses are only required to provide access when doing so is readily achievable. Establishing and running a business necessitates compliance with many laws and rules—that is the cost of doing business. It is unthinkable that we would delay or eliminate consequences for small businesses that failed to pay taxes or meet health and safety codes. Violating the rights of people with disabilities should be treated no differently

viii. There are extensive federal efforts to educate business owners about their ADA obligations, including the in-depth DOJ ADA website (**ada.gov**), the DOJ ADA hotline, extensive DOJ technical assistance materials, and the ten federally-funded regional ADA Centers that provide in-depth resources and training in every state (**adata.org**). Yet defendant have made no meaningful, proactive effort to comply with the ADA.

ix. Defendants failed to acknowledge that the ADA accessibility standards are extremely important. They are not minor details or picky rules, but rather, are essential to ensure true accessibility. A doorway that is too narrow can be the difference between accessing a business or not. A too-short bathroom grab bar can be the difference between using a restroom or being forced to go without a restroom. That said, it is

important to point out that to impose liability under the ADA, the barrier does not need to completely preclude plaintiff from entering or using the facility; it need only *interfere* with the plaintiff's full and equal enjoyment of the facility. See Lobato v. Gomez, Civil No. 15-0686 (E.D. Cal. Oct. 31, 2016); Moeller v. Taco Bell Corp., 816 F.Supp.2d 831, 848 (N.D.Cal.2011) (citing Doran v. 7-Eleven Inc., 524 F.3d 1034, 1041 n. 4 (9th Cir.2008) (discussing that the ADA "does not limit its antidiscrimination mandate to barriers that completely prohibit access.")). "Because the ADAAG establishes the technical standards required for `full and equal enjoyment,' if a barrier violating the ADAAG relates to a plaintiff's disability, it will impair the plaintiff's full and equal access, which constitutes `discrimination' under the ADA, thereby violating the ADA." Chapman v. Pier 1 Imports (U.S.) Inc., 631 F.3d 939, 947 (9th Cir.2011). s

x. People with disabilities are known to experience a loss of dignity, independence, personhood and pride associated with segregation and lack of access to public accommodations. See Kevin I. Coco, Beyond the Price Tag: An Economic Analysis of Title III of the Americans with Disabilities Act, 20 Kan. J. L. & Pub. Pol'y 58, 76, 85 (Fall 2010). Access barriers and segregation in the retail context create social stigma

and undermine feelings of self-worth and independence of persons with disabilities. See Stacey Menzel Baker, Jonna Holland and Carol Kaufman- Scarborough, <u>How Consumers with Disabilities Perceive</u> <u>"Welcome" in Retail Servicescapes: A Critical Incident Study</u>, 23 J. of Serv. Marketing 160, 167-168 (2007). They also cause people with disabilities to have a negative overall reaction to the whole retail environment, and to experience fear and discomfort in that environment. See Carol Kaufman-Scarborough, <u>Reasonable Access for</u> <u>Mobility-Disabled Persons is More Than Widening the Door</u>, 75 J. of Retailing 479, 483, 494 (1999). Studies confirm that the greater the perceptions of one's disabilities as a preventive factor in participation in the marketplace, the less satisfied one is with life.  See Carol Kaufman-Scarborough and Stacey Menzel Baker, <u>Do People with</u> <u>Disabilities Believe the ADA Has Served Their Consumer Interests?</u>, 39 J. of Consumer Aff. 1, 24 (Summer 2005).

xi. Plaintiff vehemently rejects the proposition that private enforcement of the ADA is not legitimate, regardless of the size of the business. Compliance with the ADA's physical accessibility standards requires business owners and other places of public accommodation to take proactive steps and, often, to incur costs. Unfortunately, here, the

ADA's threat of injunctive relief was not sufficient to guarantee voluntary compliance. Defendant erroneously assumes that barrier removal is more expensive than it is, and underestimates the amount of new patronage that would result from making their businesses accessible.[1] An owner's assessment of the costs and benefits of accessibility may be skewed by prejudice against or stereotyping of people with disabilities, even if the prejudice or stereotyping is unconscious. See Samuel R. Bagenstos, Subordination, Stigma, and "Disability," 86 VA. L. REV. 397, 423–24, 438–42. (2000). The ADA was not enough to convince defendant to comply with the law and the goal of this lawsuit is to see that they finally do.

34.     Access barriers at the Subject Property are being consciously ignored by the Defendants; the Defendants have knowingly disregarded the ongoing duty to remove the barriers in compliance with the ADA.

35.     Plaintiff alleges on information and belief that there are other ADA violations and unlawful architectural barriers at the Subject Property that relate to his mobility disability.

---

[1] See also, Michael Ashley Stein, The Law and Economics of Disability Accommodations, 53 DUKE L.J. 79, 124–27 (2003).

36.     Plaintiff hereby seeks to remediate and remove all barriers related to his disability, whether presently known or unknown. As the court held in <u>Doran v. 7-11. Inc.</u>, 506 F.3d 1191 (9th Cir. 2008):

> "[W]here a disabled person has Article III standing to bring a claim for injunctive relief under the ADA because of at least one alleged statutory violation of which he or she has knowledge and which deters access to, or full use and enjoyment of, a place of public accommodation, he or she may conduct discovery to determine what, if any, other barriers affecting his or her disability existed at the time he or she brought the claim. This list of barriers would then in total constitute the factual underpinnings of a single legal injury, namely, the failure to remove architectural barriers in violation of the ADA, which failure actually harmed the disabled person by deterring that disabled person from visiting a facility that otherwise would have been visited at a definite future time, yielding Article III standing."

37.     The violations and references to code sections herein are not all-inclusive. Plaintiff will amend this complaint to provide a complete description of the full scope of ADA violations after conducting a comprehensive expert site inspection. For the purposes of this Complaint, Plaintiff asserts that the

barriers alleged herein violate one or more of the ADA's implementing regulations.

**FIRST CAUSE OF ACTION**
**Discrimination Based on Disability**
**[42 U.S.C. § 12101, et seq]**
**By Plaintiff against all Defendants**

38.    Plaintiff re-alleges and incorporates by reference as though fully set forth herein the allegations contained in all prior paragraphs of this complaint.

39.    The ADA obligates owners, operators, lessees and lessors of public accommodations to ensure that the privileges, advantages, accommodations, facilities, goods and services are offered fully and equally to persons with disabilities, including the Plaintiff and others similarly situated [42 U.S.C. § 12182(a)].

40.    Discrimination is defined in the ADA, inter alia, as follows:

    i.    A failure to remove architectural barriers where such removal is readily achievable [42 U.S.C. § 12182(b)(2)(A)(iv)]. Barriers are identified and described in the Americans with Disabilities Act Accessibility Guidelines (the "ADAAG") [28 C.F.R. Part 36, Appendix "D"];

    ii.    A failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities to the maximum extent

feasible, the path of travel to the altered area and the bathrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities [42 U.S.C. § 12183(a)(2)];

iii. Where an entity can demonstrate that the removal of a barrier is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable [42 U.S.C. § 12182(b)(2)(A)(v)].

41.     The ADA, the ADAAG's 1991 Standards (the "1991 Standards") and 2010 Standards (the "2010 Standards") contain minimum standards that constitute legal requirements regarding accessibility at places of public accommodation.

42.     The Defendants have failed to comply with minimum ADA standards and have discriminated against the Plaintiff on the basis of his mobility disability. Each of the barriers and accessibility violations set forth above is readily achievable to remove, is the result of an alteration that was completed without meeting minimum ADA standards, or could be easily remediated by implementation of one or more available alternative accommodations. Accordingly, the Defendants have violated the ADA.

<u>Failure to Design and Construct an Accessible Facility</u>

43.     Plaintiff alleges on information and belief that the Subject Facility was designed and constructed (or both) after January 26, 1992 – independently triggering access requirements under Title III of the ADA.

44.     The ADA also prohibits designing and constructing facilities for first occupancy after January 16, 1993, that aren't readily accessible to, and usable by, individuals with disabilities when it was structurally practicable to do so. 42 U.S.C. § 12183(a)(1).

45.     Here, Defendants violated the ADA by designing and constructing (or both) the Facility in a manner that was not readily accessible to the physically disabled public – including Plaintiff – when it was structurally practical to do so.

<u>Failure to Make an Altered Facility Accessible</u>

46.     Plaintiff alleges on information and belief that the Facility was modified after January 26, 1992, independently triggering access requirements under the ADA.

47.     The ADA also requires that facilities altered in a manner that affects (or could affect) its usability must be made readily accessible to individuals with disabilities to the maximum extent feasible. 42 U.S.C. § 12183(a)(2). Altering an area that contains a facility's primary function also requires making the paths of travel, bathrooms, telephones, and drinking fountains serving that

area accessible to the maximum extent feasible. Id. Here, Defendants altered the Facility in a manner that violated the ADA and was not readily accessible to the physically disabled public – including Plaintiff – to the maximum extent feasible.

48. The Defendants are obligated to maintain in operable working condition those features of the Subject Property's facilities and equipment that are required to be readily accessible to and usable by Plaintiff and similarly situated persons with disabilities [28 C.F.R. § 36.211(a)]. The Defendants failure to ensure that accessible facilities at the Subject Property were available and ready to be used by the Plaintiff violates the ADA.

49. The Defendants have a duty to remove architectural barriers where readily achievable, to make alterations that are consistent with minimum ADA standards and to provide alternative accommodations where necessary to provide access. The Defendants benign neglect of these duties, together with their general apathy and indifference, violations the ADA.

50. The Defendants wrongful conduct is continuing in that Defendants continue to deny full, fair and equal access to their business establishment and full, fair and equal accommodations, advantages, facilities, privileges and services to Plaintiff as a disabled person due to Plaintiff's disability. The foregoing conduct constitutes unlawful discrimination against the Plaintiff and other

mobility disabled persons who, like the Plaintiff, will benefit from an order that the Defendants remove barriers and improve access by complying with minimum ADA standards.

## SECOND CAUSE OF ACTION
### Oregon Unlawful Trade Practices
### [Or. Rev. Stat. § 646.608(1)]
### By Plaintiff against all Defendants

51.    Plaintiff re-alleges and incorporates by reference as though fully set forth herein the allegations contained in all prior paragraphs of this complaint.

52.    The foregoing violations of the ADA constitute per se violations of the Oregon Unlawful Trade Practices (the "UTPA").

53.    Because of commercial representations by defendants, including signage outside the public accommodation, Plaintiff reasonably believed that the Subject Property was ADA compliant and accessible at the time he visited the property.

54.    The UTPA authorizes action against deceptive and unsafe business practices, including misrepresentations made in connection with the sale of goods, services, and real estate. Pearson v. Phillip Morris, Inc., 358 Or. 88, 116 (2015).

55.    By misrepresenting that the real property and business was accessible and in compliance with applicable laws, defendants caused likelihood of confusion

or of misunderstanding as to the source, sponsorship, approval, or certification of a real estate, goods or services. ORS 646.608(1)(b).

56.     By failing to invest in compliance with the federal accessibility laws, defendants engage in unfair conduct in trade or commerce against those businesses who are following the federal regulations. If accessible business are burdened because of the unfair practices of the defendants, plaintiff and other consumer will likely suffer a substantial injury. ORS 646.608(1)(u).

57.     Plaintiff is entitled to statutory damages because he was denied full and equal access to the Subject Property, because he personally encountered access barriers at the Subject Property that discriminated against him on the basis of his mobility disability and because of its misleading representations in commerce as described above.

58.     Plaintiff was denied full and equal access to the Subject Property, because he personally encountered ADA violations on a particular occasion; and because he is aware of defendants' misrepresentations and practices in commerce.

59.     Plaintiff is currently deterred from accessing the Subject Property on occasions due to his actual knowledge of the violations to federal and state

that cause unnecessarily difficulties. His actual knowledge reasonably dissuades him from accessing the Subject Property.

60.     Due to the intentional unlawful discrimination set forth above, Plaintiff has been denied the right and entitlement to full and equal accommodations, advantages, facilities, privileges or services at the Subject Property in violation of the ADA and the UTPA.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays this Court award damages and provide relief as follows:

1.     For injunctive relief compelling the Defendants to comply with the ADA and the UTPA.

2.     For damages under the UTPA in the amount of $50,000 which provides for damages of $200 or more; and

3.     For punitive damages under the UTPA in the amount of $50,000 which provides for exemplary damages. Or. Rev. Stat. § 31.730(1).

4.     For reasonable attorney's fees (counsel will be retained in due course), litigation expenses and costs of suit pursuant to 42 U.S.C. § 12205.

Dated this September 13, 2019

JOSE VELEZ

PLAINTIFF

IN PROPRIA PERSONA